UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PHYLLIS HILL, *et al.*,

                   Plaintiffs,                Case No. 13-14939
                                            HON. GERSHWIN A. DRAIN

vs.

FAMILY TYES INC., A/K/A
FAMILY TYES ADULT FOSTER CARE,
*et al.*,
                    Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CANCELLING MAY 22, 2015 HEARING

## I.    INTRODUCTION

On April 14, 2014, Plaintiffs Phyllis Hill, April Agee, Audrey Davis, Theresa Johnson and Desare Oliver filed a First Amended Complaint[1] alleging that Defendants Family Tyes, Inc., a/k/a Family Tyes Adult Foster Care, The Kirkland Group, L.L.C., Residential Outreach Community Center, and Sheryl Carson have violated the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* ("FLSA") (Count I), as well as Michigan's Minimum Wage Law of 1964, MICH. COMP. LAWS § 408.381 *et seq.*

_____

[1] This action was originally filed on December 3, 2013.

(Count II).[2]

Presently before the Court is Defendants' Motion for Summary Judgment, filed on March 3, 2015.  Plaintiffs filed a Response on March 24, 2015, and Defendants filed a Reply in support of their present motion on April 2, 2015.  Upon review of the parties' briefing, the Court finds that resolution of the instant motion does not require oral argument.  As such, the Court will cancel the May 22, 2015 hearing and will determine the motion on the briefs submitted.  *See* E.D. Mich. L.R.  7.1(f)(2).   For the reasons that follow, the Court will deny Defendants' Motion for Summary Judgment.

## II.    FACTUAL BACKGROUND

Plaintiffs are direct care workers who are either currently or formerly employed by the Defendants.  Only Plaintiffs Agee and Davis are still employed by Defendants. Defendants are three business entities that operate licensed adult foster care homes. Defendant Sheryl Carson is the sole member of The Kirkland Group, LLC.  During the period applicable to Plaintiffs' claims, Defendant Family Tyes, Inc. operated five

---

[2]  Michigan's Minimum Wage Law of 1964 was repealed; effective May 27, 2014 and replaced with the Workforce Opportunity Wage Act of 2014.  Plaintiffs indicate in their Response that they brought their claims in the alternative because they were unsure whether Defendants were covered by the FLSA.  Since Defendants admit they fall within the coverage of the FLSA, Plaintiffs agree that their claim under state law should be dismissed.  Accordingly, Plaintiffs' state law claim is hereby dismissed from this cause of action.

group homes and Defendants The Kirkland Group, LLC and Residential Outreach Community Center each operated one group home.  Defs.' Mot., Ex. 1 at ¶ 2.

The residents of Defendants' homes are referred to as "consumers" by the parties consistent with the parlance of local community mental health agencies. Defendants maintain that the consumers residing in their homes are generally high functioning with the ability to toilet and dress themselves.  Each consumer has an individualized care plan which defines the required levels of assistance and supervision.  According to Defendant Carson, none of the consumers' care plans require any form of overnight monitoring, bed checks, medication administration, or assistance with using the bathroom during sleep time.  *Id.*, Ex. 1 at ¶ 6.

Defendants' Job Description for the Direct Care Worker position includes, "supervising the residents, teaching basic self-care skills, and assisting in the development and maintenance of a therapeutic environment."  *Id.*, Ex. 2 at 1. Emphasis for direct care workers is directed to teaching daily living skills rather than actually performing tasks on behalf of consumers. *Id.*  Consumers are encouraged and directed to dress, groom and perform some housekeeping themselves.  *Id.*, Ex. 1 at ¶ 7.

Plaintiffs were typically scheduled on 24 hour shifts commencing at 9:00 a.m. and ending at 9:00 a.m. the next day.  Each shift has a sleep time component, from

approximately 9:00 p.m. or 10:00 p.m. to 6:00 a.m. or 7:00 a.m., when the consumers were asleep. Defendants claim that sleeping quarters were available for staff at each home. Floor plans for each group home, submitted to the Michigan Bureau of Children and Adult Licensing as part of the adult foster care licensing process, demonstrate that a separate bedroom was designated for staff use. *Id.*, Ex. 5.

Defendants relied on information from the Department of Labor when implementation of the sleep time exclusion occurred in 2002. *Id.* at ¶ 9. Each portion of a shift was subject to a sleep time exclusion, which is set forth in the Family Tyes Incorporated Adult Foster Homes Employee Policy and Manual, which states:

> Staff will be given 9 hours down time (bed time) after regular hours while on duty with Consumers. If staff is approached and/or must get up to attend to a Consumer during your down time period, it is considered overtime. If approached by a Consumer with an issue during this down time period, you are required to address the issue. This must be documented stating the time it occurred, what happened, why it happened, who it involved. This information must be submitted to the supervisor immediately. The incident will be reviewed by the administrator or employee's supervisor.

*Id.*, Ex. 3 at 19.

During their orientation, each Plaintiff signed an acknowledgment that they "received, read and support the above information" from the Employee Policy and Manual. *Id.*, Ex. 4.

Plaintiff Hill appears to dispute that she received the Employee Manual at the

-4-

time of hire.  At her deposition, she stated that she never received a handbook. Plfs.' Resp., Ex. 1 at 23.  However, this testimony is belied by her January 26, 2012, signed acknowledgment form wherein she claimed to "have read the Family Tyes AFC policy/procedures [and] fully understood . . . and []agree[d] to follow the rules, regulations and guidelines set forth in this manual."  Defs.' Mot., Ex. 4.  Defendants further assert that a complete copy of the Employee Policy and Manual containing the sleep time policy is maintained in each of Defendants' group homes.  *Id.*, Ex. 1 at ¶ 10.  Defendants also maintain that the sleep time policy is explained to staff at the time of hire.  *Id.* at ¶ 11.

Defendants' pay period was based upon a forty (40) hour, seven day week. Plaintiffs were paid a daily rate of $118.40 for the first two shifts of the week, a daily rate of $148.00 for the third shift worked, and $177.00 for each shift thereafter during a single week.[3]  The daily rate of $148.00 for the third shift of the pay period reflects that the first eight hours of the shift fell under the forty (40) hour standard workweek, but the second eight hours were paid at a the time-and-a-half rate of $11.10.  The daily rate of $177.00 for each shift after the third shift consists of sixteen (16) hours at the time-and-a-half rate.

---

[3]  These rates increased to $130.40; $163.00 and $195.60; respectively with the increase in Michigan's minimum wage to $8.15 per hour in September of 2014.

Defendants maintain that all of the paychecks received by the Plaintiffs reflect the sleep time arrangement. However, Plaintiffs' pay check stubs do not itemize hours worked. The group homes did not have a system for employees to report their actual working times, such as time cards or a time clock. Rather the Plaintiffs filled out forms showing the dates and shifts that they worked.

While Defendants assert that Plaintiffs were usually afforded an uninterrupted night's sleep, each of the Plaintiffs has testified that she was unable to get five hours of sleep per night. Plaintiffs Davis, Agee and Oliver testified that they were responsible for responding to consumers' needs throughout their 24-hour shifts and were never free of that responsibility while consumers were in the group home. Plfs' Resp., Ex. 2 at 32, Ex. 3 at 30, Ex. 7 at 48. Plaintiff Davis testified that she might "nod off but [I] don't sleep-sleep." Plfs.' Resp., Ex. 2 at 12. She further explained that she really could not sleep during the night because she had to do rounds in the middle of the night, respond to every noise and check on the consumers. *Id*. at 25. She was "lucky" to get an hour's sleep during a 24-hour shift. *Id.* at 33-34.

Plaintiff Johnson testified that "we never really had too much down time to sleep," because some consumers might go to bed at around 10:00 p.m., but some might be up until 1:30 or 2:00 a.m., or even as late as 5:00 a.m. Plfs.' Resp., Ex. 6 at 9. There were some nights that she would get 3 to 4 hours of sleep, but never more

than that. *Id.* at 24.

> Plaintiff Hill testified that there really was no "sleep time." She explained that:
>
> because our sleep was interrupted because we're one person with six other people who have different issues so they have different sleep patterns, you might want to go to sleep, you might attempt, you might get, you know, close your eyes and then I need some water or somebody's trying to slip out the door, someone injured themselves, someone fell.

Plfs.' Resp., Ex. 1 at 17.

Plaintiff Agee testified that there were no nights of uninterrupted sleep during her employment, and that she could not even sleep in a bedroom because she could not hear the consumers from the bedroom. Plfs.' Resp., Ex. 3 at 24, 29. Therefore, when she could sleep, she would do so at a table or on a bench, but never for longer than an hour to an hour and a half because she had to be alert to consumers' needs or problems. *Id.*

Plaintiff Oliver testified that she was told "down time" was from midnight to 6:00 a.m., "but it was never really a downtime because we have clients who take medication during the night, you had some that were up. It was never a consistent hour of sleep." Plfs.' Resp., Ex. 7 at 26.

There were at least two staff meetings, attended by Plaintiffs Hill and Johnson, in which the sleep time policy was reviewed.[4] The meeting minutes from the January

---

[4] Plaintiff Oliver was no longer employed by Defendants and Plaintiff Davis had not started her employment.

31, 2013 meeting state in relevant part:

> Live-in staff must rest 8 hours after Consumers are in bed, when consumers are not sleeping during the night, staff is to document why they are up and how staff handled their movement on an Incident Report. The Incident Report is to be faxed into the office. Provider will determine if there is a need for midnight relief.

*Id.*, Ex. 8 at 3.

Staff meetings were also held in March of 2014 and included review of the sleep time policy. The meeting minutes from the March meetings indicate the following was reviewed:

> Administrative Assistant J. Harrison explained that staff would receive 8 hours of down time and that 5 hours of that time was designated as uninterrupted time for sleep. If there was an interruption of sleep by a consumer, staff would have to document the incident on an Incident Report (IR). The report must be sent to the home manager by fax to the office where the IR would be reviewed and submitted to payroll for payment.

*Id.*, Ex. 9 at 7.

Plaintiffs Agee, Davis, Hill and Johnson were in attendance at both of the March meetings in 2014. While Davis was in attendance at the March meeting in 2014, she testified at her deposition that she never received any training concerning the procedure for documenting overtime requests. Plfs.' Resp., Ex. 2 at 16. She testified as follows:

> Q.    You ever have any training that tells you about how to document

|   |   |
|---|---|
| | overtime requests? |
| A. | No. |
| Q. | So if a consumer's up and, say, they keep you up 6 hours during the night, you document that on the progress notes? |
| A. | A progress note and an incident report. |
| Q. | And were you ever told that you were to turn in the incident reports in to request overtime? |
| A. | Yes. |
| Q. | Who told you that, if you can remember? |
| A. | Well, I wouldn't consider overtime as just sending an incident report stating that they've been up all night. |
| Q. | And you didn't consider that overtime? |
| A. | No. |

*Id.*, Ex. 2 at 16-17.

Moreover, while Plaintiff Agee attended the March 2014 meeting, she claims that she was told Defendants did not pay overtime.  She testified that:

|   |   |
|---|---|
| Q. | Have you ever been compensated for overtime? |
| A. | No. |
| Q. | So you've never been paid overtime. |
| A. | No. |
| Q. | So when did you, I guess, speak to Ms. Marks?[5]  When do you first remember speaking to Ms. Marks about this issue of overtime? |
| A. | Actually, I can't even remember back because I been there so long.  So it has been spoken of probably almost the whole time I been there, so. |
| Q. | Okay.  Starting in 2010? |
| A. | Basically. |
| | *          *          * |
| Q. | What was Ms. Marks' response? |
| A. | About the overtime, really it was just–her response was she had to |

---

[5]  Angela Marks is the Home Manger for Defendants' group homes.

       talk to Sheryl about it.

Q.     Okay.

A.     We inform her, she informs her.

Q.     Okay.  She had to talk to Sheryl.  She ever tell you we don't pay overtime?

A.     Yeah.  Because I never got it, so–well, I get what you're okay. She had mentioned to me that they don't pay overtime.  Because that's the process of speaking to her and speaking to Sheryl, and it would come back no overtime.

       *                 *                 *

Q.     Did Ms. Marks ever provide you with any information on how to get overtime?

A.     The last, no–two meetings–I been working for four years.  We've only had three meetings since I been working there.

       The second meeting they had I didn't make . . . .  But later on, after the meeting, it was mentioned to me that we have to do     incident reports for overtime.  And I've turned in incident reports     f o r overtime and don't hear anything else about it.

       *                 *                 *

Q.     Did you ever receive anything in writing about how to fill out an incident report?

A.     No.

*Id*., Ex. 3 at 13-16.  Plaintiff Hill also testified that she was told Defendant did not pay overtime.  *Id*., Ex. 1 at 14.

In April of 2014, Plaintiffs Davis and Hill reviewed Employee Policy Acknowledgments specific to the sleep time agreements and initialed each of the following statements:

> I understand that I will have 8 hours of unpaid down time (bed time) and of the 8 hours; 5 hours are uninterrupted sleep time after my regular shift ends each work day with the Consumers.

-10-

I understand that if I am approached by a Consumer with an issue during my down time period (8 hours) I must address the issue.

I affirm that the organization provides quarters and storage for my down time.

I understand that if I am approached and/or must get up to attend to a Consumer during my down time period (8 hours) it is considered overtime. I understand that I must document the issue on an Incident Report stating the time it occurred, what happened, why it happened, who it involved, and this must be documented on an Incident Report.

I understand that the Incident Report must be submitted/faxed to the office or given to the Home Manager before my shift end and the incident will be reviewed by the administrator or employee's supervisor.

Defs.' Mot., Ex. 10.

Defendant Sheryl Carson and current Home Manager Angela Marks spent several years on the 24 hour schedule at Defendants' group homes. *Id.*, Ex. 1 at ¶ 15; Ex. 11 at ¶ 2. Both Carson and Marks would have down time or sleep time from approximately 10:00 p.m. until 7:00 a.m. the next morning. *Id.*, Ex. 1 at ¶ 16; Ex. 11 at ¶ 3. Carson was a direct care worker from 1987 to 1993 and claims to have experienced one or two interruptions per month during down time while she was a direct care worker. *Id.*, Ex. 1 at ¶ 17. Marks was a direct care worker on 24 hour shifts for the Defendants from 2002 until she was promoted to management in 2013. *Id.*, Ex. 11 at ¶ 5. Before her promotion, Marks reported being interrupted an average

of once or twice per month for five to ten minutes.  *Id.* at ¶ 4.

Defendants argue that each Plaintiff was only able to recall one or two incidents where they reported sleep time interruptions for which they were paid if they completed an incident report as directed.  However, the record appears to contravene Defendants' contention.  For instance, Plaintiff Johnson testified that:

> I had a consumer that kept me up 2 days straight, okay.  I replied it, sent in the incident report.  I was scold [sic] about how I put in the incident – what I put in the incident report.  It took me – I kept pushing it and pushing it, because we had had a meeting that we would be paid for overtime.  So I did everything she replied for us to do.  I did it, put in incident, and I'm pushing and pushing where I wanted to get paid, because I was actually pissed because I had stayed up 2 days straight, no sleep, okay....
> Q.    When did that happen?
> A.    I really can't quote the day.
> Q.    Tell me the year.
> A.    This was in 2013.
> Q.    2013?
> A.    Yes.
> Q.    Summer?  Spring?
> A.    Summer.  So I pushed the fact to get paid, okay.
>
> *              *                         *
> A.    And it took about 2 weeks, maybe 3, but she did pay me.

*Id.*, Ex. 12 at 19-21.

Defendants further assert that while both Plaintiffs Agee and Davis complained about not receiving overtime, neither Agee nor Davis ever submitted incident reports to get paid.  Yet, Agee testified at her deposition that she has documented interrupted

-12-

sleep during her shifts due to the consumers on incident reports and was never compensated. *Id*., Ex. 6 at 20-21. Plaintiff Davis also testified she would document when a consumer is up all night in an incident report. *Id*., Ex. 13 at 16. In fact, according to Defendants, since the March staff meetings in 2014, only two incident reports have been submitted, both by Plaintiff Hill. Plaintiff Hill was paid for both sleep time interruptions.[6] However, Plaintiff Oliver testified that the homes she worked at were always out of incident reports. *Id*., Ex. 14 at 34-35.

All of the Plaintiffs testified that they recorded sleep time interruptions by consumers on Progress Notes. Defendants analyzed Progress Notes covering 873 shifts charted by the Plaintiffs from January of 2011 through January of 2015. Only a little more than 10 percent, or 10.9 % of the shifts analyzed charted that sleep time was interrupted. However, at least one Plaintiff has testified that sometimes the homes she was working at would run out of progress reports for two to three weeks. *Id.*, Ex. 14 at 36.

## III.   LAW & ANALYSIS

### A.   Standard of Review

Federal Rule of Civil Procedure 56(a) empowers the court to render summary

---

[6] Hill claims to have complained to her supervisor about overtime, but did not prepare any additional incident reports for these sleep time interruptions.

judgment forthwith "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

-14-

242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

## B.    Defendants' Motion for Summary Judgment

### 1.    Sleep Time Exclusion

The FLSA  generally requires a covered employer to pay employees at least one-and-one-half times their regular wage rate for hours the employees work in excess of forty hours in a given work week.  29 U.S.C. § 207(a)(1).  Defendants argue that their payment structure falls within a saving clause of the Act, 29 U.S.C. § 259, which relieves the employer from payment of minimum wages or overtime wages when it can show the failure to pay was "in good faith in conformity with and in reliance on

any written administrative regulation, order, ruling, approval, or interpretation of" the "Administrator of the Wage and Hour Division of the Department of Labor." 29 U.S.C. § 259(a) and (b)(1).

Specifically, federal regulation permits employers to utilize a sleep time exclusion to the minimum wage and overtime pay requirements where an employee is scheduled for a shift of at least 24 hours. 29 C.F.R. § 785.22. The regulation states:

> (a)  General. Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If sleeping period is more than 8 hours, only 8 hours will be credited. Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.
>
> (b)  Interruptions of sleep. If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.

29 C.F.R. § 785.22(a)(-b)(internal citations omitted).

The sleep time exclusion is available only if the employer establishes: 1) the existence of an agreement for exclusion of sleep time from work time; 2) adequate

sleeping facilities were provided; and 3) the employee can usually enjoy an uninterrupted night's sleep. *H.W. Arians v. Olin Mathieson Chemical Corp.*, 382 F.2d 192, 197 (6th Cir. 1967).

Defendants argue that there is no genuine issue of material fact that they can establish they have acted in good faith in conformity with the sleep time exclusion. While the Court agrees that there is no question of fact as to the existence of an implied agreement excluding compensation for sleep periods, the Court also concludes that questions of fact exist as to whether adequate sleeping facilities were provided and whether Plaintiffs can usually enjoy an uninterrupted night's sleep. As such, the Court is unable to conclude as a matter of law that Defendants are entitled to rely on the FLSA's saving clause because material issues exist concerning whether Defendants acted in good faith in conformity with the sleep time exclusion.

### a) Sleep Time Agreement

Here, Plaintiffs acceptance of paychecks that did not compensate them for sleep time periods coupled with their signed acknowledgments that they "received, read and support the above information" from the Employee Policy and Manual is sufficient for finding that an implied agreement existed between the parties. The Employee Policy and Manual discussed the sleep time or "down time" that would not be compensated unless the employee was approached by a consumer during that time

period.

It has long been settled that sleep time agreements may be implied.  *See H.W. Ariens v. Mathieson*, 382 F.2d 192, 197 (6th Cir. 1967).  In *H.W. Ariens*, the plaintiffs were firefighter-guards at an Indiana Ammunition Plant.  *Id.* at 194.  The firefighters worked 24-hour shifts and were not compensated for sleep periods.  *Id.*  They "'found out' about the schedule on the first day of work."  *Id.*  The *H.W. Ariens* court concluded that "there was a meeting of minds resulting in a valid agreement that plaintiffs would not be paid for sleeping time."  *Id.* at 197.

The *H.W. Ariens* court relied on the fact that "[t]he work schedule was explained in the pamphlet given to each man before he commenced work[,]" as well as that the plaintiffs "continued throughout the time in question to accept paychecks which excluded sleeping time from hours worked."  *Id.*  Therefore, "this was sufficient to constitute an implied agreement between the parties within the meaning of the" regulation.  *Id.*; *see also Braziel v. Tobosa Developmental Servs.*, 166 F.3d 1061, 1062 (10th Cir. 1999) (employees accepted checks reflecting unpaid sleep time, thus they "understood and acquiesced to the policy when they were hired.") Here, Defendants' Employee Policy and Manual expressly informed the Plaintiffs that they would receive 9 hours of down time for which they were not paid.  Additionally, the Plaintiffs continued to accept paychecks that did not include compensation for the

down time or sleep period discussed in the Employee Manual.

Plaintiffs do not dispute that an implied agreement is sufficient to meet this element of the sleep time exclusion, but argue that the facts herein do not demonstrate an implied agreement. Plaintiffs argue that they had no knowledge that a period of sleep time would be deducted from their working hours. Plaintiffs assert that none of the documents provided by Defendants expressly state that hours were deducted from the 24-hour shift and that these hours were considered uncompensated time. Plaintiffs also rely on the fact that their paychecks show the number of shifts worked rather than the number of hours. This argument lacks merit since it is beyond dispute that Plaintiffs knew they were not being compensated for sleep periods. As such, they are just like the firefighter-plaintiffs in *H.W. Ariens* who "continued throughout the time in question to accept paychecks which excluded sleeping time from hours worked." *Id.* Plaintiffs try to distinguish their factual circumstances from *H.W. Ariens* by arguing that in that case the plaintiffs' paychecks "clearly excluded sleeping time from the hours worked." However, the *H.W. Ariens* decision does not contain these facts and the Plaintiffs are incorrect to suggest the case is distinguishable.

In any event, it cannot be argued that the Plaintiffs herein were unaware that they were not being compensated for sleep periods during their shifts. Plaintiff Agee testified that she regularly discussed overtime with her supervisors. Defs.' Mot., Ex.

-19-

6 at 12-13.  Plaintiff Davis testified that she reviewed her paychecks and knew if she was underpaid.  *Id.*, Ex. 1 at 17-18. Additionally, both Plaintiffs Hill and Oliver complained about not receiving overtime.  *Id.*, Ex. 3 at 14, 32-33.   Plaintiff Johnson testified that she carefully reviewed her paychecks for accuracy:

> Q.    How would you know if you had a discrepancy in your pay?
> A.    Because I would look at my paycheck, because I know the hours that–up here that I worked, okay.  This is computerized when it comes to my money.
> Q.    So you know the hours that you worked and you know how much you were paid per hour so you could just calculate it?
> A.    Yes sir.

*Id.*, Ex. 2 at 27-28.  Like all of the Plaintiffs, Johnson reviewed and accepted paychecks that did not provide compensation for sleep time throughout her employment with the Defendants.

The record before the Court establishes the Plaintiffs accepted paychecks that did not compensate them for sleep time periods, as well as signed acknowledgments that they read Defendants' Employee Policy and Manual, which discussed that down time was uncompensated.  Thus, there is no question of material fact that an implied agreement existed between the parties that sleep time was uncompensated.

### b) Adequate Sleeping

This factor of the test is established where there is a "home-like environment" meaning a bed is provided and some separation exists between the employee and the

general workplace. *Bouchard v. Reg'l Governing Board of Region V Mental Retardation Servs.*, 939 F.2d 1323, 1331 (8th Cir. 1991). The employer must provide more than a couch or hideaway bed in a common area. *Hultgren v. County of Lancaster*, 913 F.2d 498, 506 (8th Cir. 1990).

Defendants argue that each of the group homes had separate sleeping quarters for the Plaintiffs. Defendants further assert that there is no evidence that the Plaintiffs were required to sleep in common areas on couches or reclining chairs, rather this was the choice of the individual Plaintiff.

Contrary to Defendants' contention there is a question of fact as to whether adequate sleeping facilities were available at each of the group homes. Plaintiff Davis testified that the designated room for staff was occupied by two consumers when she began working at the Melvindale home and another home had no available room for staff. *See* Plfs.' Resp., Ex. 2 at 29-32. Plaintiff Oliver testified that several of the group homes she worked at did not have an adequate room for sleeping. *Id*., Ex. 7 at 23-24. Lastly, Plaintiff Johnson testified that several of the homes had problems with bed begs and it was not possible to sleep in the room set aside for the staff. *Id*., Ex. 6 at 29.

Based on the foregoing, Plaintiff has come forward with sufficient evidence demonstrating there is a material question of fact as to whether Defendants provided

adequate sleeping facilities for the Plaintiffs.

### c) Uninterrupted Night's Sleep

Lastly, in order for Defendants to come within the sleep time exclusion, it must be demonstrated that Plaintiffs could usually enjoy an uninterrupted night's sleep. *H.W. Ariens*, 382 F.2d at 197. Defendants argue that the progress notes show that Plaintiffs charted sleep time interruptions only 10.9% of all overnight shifts. Defendants further rely on the Declarations of Defendant Carson and Home Manager Marks, who both claim to have experienced infrequent sleep time interruptions during the time they worked as direct care workers. Defendants also maintain that after the meetings concerning reporting sleep time interruptions, the Plaintiffs should have been documenting such interruptions in an incident report. However, only two incident reports have been submitted, and both resulted in overtime pay for Plaintiff Hill. Defendants argue that the infrequent charting and reporting of sleep time interruptions establishes that there are no genuine issues of material fact that Plaintiffs were provided an opportunity to usually enjoy an uninterrupted night's sleep.

While Defendants assert there is no genuine issue of material fact that Plaintiffs were generally afforded an uninterrupted night's sleep, each of the Plaintiffs has testified that she was unable to get five hours of sleep per night. Plaintiffs Agee, Davis and Oliver testified that they were responsible for responding to the consumers'

needs and problems throughout the entire 24-hour shift.   Because the consumers all had different sleep patterns, Johnson testified that there were some nights she would get 3-4 hours of sleep, but never more than that.  Plaintiff Oliver also testified that some of the consumers took medication at night and so she never really had any "down time."

Defendants reliance on Defendant Carson's and Home Manager Marks' Declarations concerning their experiences while working as direct care workers is not probative evidence of whether Plaintiffs were able to receive uninterrupted sleep during their shifts.   Defendants contention that the consumers did not require any form of overnight monitoring, bed checks or medicine administration at night is contradicted by the Plaintiffs' deposition testimony.   Plaintiff Davis described consumers who liked to try to sneak out or who would fall out of bed.  The Plaintiffs further claim that they were required to respond to the consumers' needs throughout their entire shift. Plaintiff Oliver testified that some of the consumers took medication at night and Plaintiff Agee testified that she had to be able to respond to consumers' problems at all hours of the night.

Defendants also place too much emphasis on the progress reports and the fact that they do not reflect that Plaintiffs experienced more than 10% of uninterrupted sleep because the progress reports related to the circumstances of the consumers, not

the direct care workers. Employees were tasked with documenting such things as falls or sneaking out, whether the consumer was up all night, the consumers' activities during the day and the medications that were distributed. There is no space on the progress reports for recording whether the direct care worker slept or how much down time the worker had during a given shift. Moreover, there is evidence in the record that blank progress reports were missing from homes on occasion. Thus, it is not clear whether Defendants' analysis of the progress reports provides an accurate picture of the circumstances at Defendants' homes.

While it is true that Plaintiffs failure to submit incident reports when they experienced a sleep interruption supports Defendants good faith reliance on the regulation, the Court is nonetheless unable to conclude as a matter of law that Plaintiffs generally received uninterrupted sleep during their shifts. There is evidence that some of the group homes would run out of incident reports, as well as evidence that some of the Plaintiffs in fact documented sleep interruptions on incident reports but did not receive overtime compensation. Additionally, there is evidence in the record that after her training in 2013, Plaintiff Johnson submitted an incident report when she worked two days without any sleep. Johnson testified that she had to push and push to get paid for her sleep interruption and was scolded for submitting the interruption on the incident report.

Based on the record evidence, the Court cannot find as a matter of law that Defendants acted in good faith compliance with the sleep time exclusion regulation.

## 2.   Willfulness

The FLSA provides for a two year statute of limitations "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.  29 U.S.C. § 255(a).  To determine whether an employer committed a willful violation of the FLSA, the district court must examine whether "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute . . . ."  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  Evidence that an employer had knowledge of a violation but failed to take remedial actions, or "failed to make [an] adequate inquiry into whether [its] conduct [was] in compliance with" the FLSA is sufficient to show reckless disregard.  *Bull v. United States*, 68 Fed. Cl. 212, 242 (Fed. Cl. 2005).

Here, there is a question of fact as to whether Defendants displayed reckless disregard for ensuring its conduct complied with the FLSA.  There is evidence in the record that even when a direct care worker submitted an incident report documenting uninterrupted sleep during a shift, she was scolded for submitting the report and had to push and push in order to receive overtime compensation.  Moreover, the progress reports reflect some uninterrupted sleep occurrences, however it is not clear from the

record that Defendants actually compensated the Plaintiffs for these interruptions. Therefore, there is a question of fact as to whether Defendants willfully violated the FLSA.

### 3.    Liquidated Damages

The FLSA provides that an employer who violates the act "shall be liable . . . in the amount of [the employee's] . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages.  29 U.S.C. § 216(b).  "Liquidated damages under the FLSA are compensation, not a penalty or punishment." *Elwell v. Univ. of Hosps. Home Care Servs*., 276 F.3d 832, 840 (6th Cir. 2002).  The Court has discretion to award no liquidated damages or a lesser amount of liquidated damages, but only "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not in violation" of the FLSA. 29 U.S.C.§ 260.


"This burden on the employer is substantial and requires 'proof that [the employer's] failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict.'" *Elwell*, 276 F.3d at 840.  "In the absence of such proof a district court has no power or discretion to reduce an employer's liability for the

equivalent of double unpaid wages." *Id.* (quoting *Herman v. Palo Group Foster Home*, 183 F.3d 468, 474 (6th Cir. 1999). Reasonableness is an objective standard, and an employer who acts negligently in failing to properly classify an employee and pay him in accord with the FLSA is not acting reasonably. *Elwell*, 276 F.3d at 841 n.5.

Here, there are genuine issues of material fact as to whether Plaintiffs had adequate sleeping facilities and whether they were afforded at least five hours of uninterrupted sleep. Thus, the Court cannot conclude whether Defendants acted in good faith compliance with the sleep time exclusion. As such, the Court is unable to determine whether any failure to obey the FLSA "was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose" liquidated damages in addition to compensatory damages. For this reason, genuine issues of material fact exist as to whether Plaintiffs are entitled to liquidated damages.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [#29] is DENIED.

Count II, Violation of Michigan's Minimum Wage Law of 1964, MICH. COMP. LAWS § 408.381 *et seq*., is HEREBY DISMISSED from this cause of action.

SO ORDERED.

-27-

Dated: May 12, 2015                    /s/Gershwin A Drain
                                       GERSHWIN A. DRAIN
                                       UNITED STATES DISTRICT JUDGE